**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JEFFRY A. JACKSON,

                                        Plaintiff,

            - v -                                        Civ. No. 1:03-CV-722
                                                              (RFT)
KATHY JIMINO, individually and as Rensselaer County
Executive, and RENSSELAER COUNTY,

                                        Defendants.

**APPEARANCES:**                                   **OF COUNSEL:**

OFFICE OF PETER HENNER                      PETER HENNER, ESQ.
Attorney for Plaintiff
P.O. Box 326
Clarksville, NY 12041

KERNAN PROFESSIONAL GROUP, LLC              DAVID A. BAGLEY, ESQ.
Attorney for Defendants
1310 Utica Street
P.O. Box 750
Oriskany, NY 13424

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**MEMORANDUM-DECISION and ORDER**

        Plaintiff Jeffry Jackson brings a civil action pursuant to 42 U.S.C. § 1983, alleging that his

First Amendment right to free speech was violated when Defendants failed to reappoint him as the

Director of the Bureau of Real Property Tax Services in retaliation for speaking out about

Rensselaer County Local Law No. 6.  Dkt. No. 1, Compl. at ¶¶ 128-41.  Plaintiff further alleges that

Defendant Rensselaer County is liable for actions taken by Jimino, as a final policymaker, for

failing to reappoint him as retaliation for exercising his First Amendment right and that Defendant

Jimino's failure to fulfill her promise to assist Plaintiff in obtaining other public employment

constituted a breach of contract. *Id.* at ¶¶ 142-51. Defendants bring a Second Motion for Summary Judgment.[1] Dkt. No. 38. Plaintiff opposes the Motion. Dkt. No. 41. For the reasons to follow, the Defendants' Motion for Summary Judgment is **granted in part and denied in part**.

## I.  FACTS

Plaintiff, a Rensselaer County employee for twenty-six (26) years, worked as the County Director of Real Property Tax Services for approximately ten (10) years. Compl. at ¶ 1; Dkt. Nos. 25 & 41, Pl.'s Dep., dated July 27, 2004, at p. 6, lines 16-24, p. 9, lines 15-24, & p. 10, lines 1-13.[2] As Director, Plaintiff was an "independent officer reporting directly to the county legislative body[.]" Dkt. No. 38, Defs.' 7.1 Statement at ¶ 5; Dkt. No. 41, Pl.'s 7.1 Statement at ¶ 5.[3] Pursuant

---

[1] On December 9, 2004, Defendants filed their First Motion for Summary Judgment. Dkt. No. 22. Upon Oral Order by the Honorable Gary L. Sharpe, United States District Judge, summary judgment was denied as to Defendants Jimino and Rensselaer County, but was granted as to Defendant Zwack, who was dismissed from the action. Oral Order, dated May 20, 2005. Then, on September 8, 2005, pursuant to 28 U.S.C. § 636(c), FED. R. CIV. P. 73, and N.D.N.Y.L.R. 72.2(b), the parties consented to a disposition of this matter by the undersigned. Dkt. No. 31. This Court set a trial date in October 2005, however, the Court learned of a United States Supreme Court case, *Garcetti v. Ceballos*, __ U.S. __, 126 S. Ct. 1951, 1957 (2006), that could have an impact on the current case and stayed the case pending the Supreme Court's ruling. *See* Dkt. Nos. 32, Trial Order, 35, Defs.' Lt.-Mot., dated Oct. 13, 2005, & Text Order, dated Oct. 14, 2005. On June 1, 2006, the Court learned a decision had been issued by the Supreme Court. Text Order, dated June 1, 2006. In light of the Supreme Court's ruling in *Garcetti*, this Court held a conference with all parties. In light of that discussion, this Court lifted the stay and granted Defendants permission to file a Second Motion for Summary Judgment as to the following limited issues: 1) the effect of *Garcetti*; 2) whether Plaintiff's speech was protected; 3) law of the case; and 4) qualified immunity. *See* Dkt. No. 38, Second Mot. for S.J., Minute Entry, dated June 20, 2006, & Text Order, dated June 20, 2006. It is these discrete issues that are now before this Court.

[2] The Court orally granted Plaintiff permission to provide hard copies of the depositions already filed in the first Motion for Summary Judgment to the Court. This permission would obviate the need to refile them on the docket in his Opposition to the Second Motion for Summary Judgment.

[3] Plaintiff and Defendants dispute as to whom Plaintiff reported to as the Director - the county executive or the legislature. Dkt. No. 42, Defs.' Reply at ¶ 4(c); Pl.'s 7.1 Statement at ¶ 25. Referring to his Complaint, Plaintiff cites to N.Y. REAL PROP. TAX LAW § 1530, noting that the heads of departments are appointed by the county executive and as such Plaintiff was appointed by and reports to the county executive. Pl.'s 7.1 Statement at ¶ 25. Defendants, on the other hand, cite to paragraph fourteen (14) in the Complaint which states that the Director of Real Property Services reports directly to the legislative body. Defs.' Reply at ¶ 4(c). The Exhibit accompanying this paragraph in the Complaint, the focus of which was based upon the notion that reappointment should not be denied due to party affiliation, states that "the standards, powers and duties of the office of the director . . . establish the director as an independent officer reporting directly to the county legislative body and that the duties assigned to the agency must be performed impartially . . . ." Compl., Ex. E, Opinion of Counsel SBEA No. 111.

to N.Y. REAL PROP. TAX LAW § 1532, the Director's duties include, *inter alia*, preparing and maintaining tax maps as well as providing copies of the maps in accordance with N.Y. REAL PROP. TAX LAW § 503.  Defs.' 7.1 Statement at ¶ 6; Pl.'s 7.1 Statement at ¶ 6.  Under N.Y. REAL PROP. TAX LAW § 503, the original tax maps are to be filed in the Director's office.  Defs.' 7.1 Statement at ¶ 7; Pl.'s 7.1 Statement at ¶ 7.  In conjunction with other duties, the Director provides advisory services to city and town assessors.  Defs.' 7.1 Statement at ¶ 8; Pl.'s 7.1 Statement at ¶ 8.

Plaintiff states that when he became the Director of Real Property Tax Services, he took an oath to uphold the Constitution and laws of the State of New York, including those which involved the proper performance of his duties under the Real Property Tax Law.  Defs.' 7.1 Statement at ¶ 15; Pl.'s 7.1 Statement at ¶ 15.  During his service in this position, Plaintiff spoke out as to his concern over the legality of Rensselaer County Local Law No. 6, which transferred tax mapping services from his department to the County's Bureau of Research and Information Services ("BRIS").  Defs.' 7.1 Statement at ¶¶ 9 & 16; Pl.'s 7.1 Statement at ¶¶ 9 & 16.  In his objection to the transfer, Plaintiff communicated at work and publicly from 1996 until 2002 through letters and memoranda about this issue and the potential effects on the administration of real property tax within Rensselaer County.  Defs.' 7.1 Statement at ¶¶ 10 & 17; Pl.'s 7.1 Statement at ¶¶ 10 & 17.  Plaintiff asserted that the transfer of mapping services "made it difficult for the [Bureau of Tax Services] to perform an essential element of its service function to assessors, [] severely hampered the administration of the local property tax throughout Rensselaer County, and made it difficult for the Bureau of Tax Services to supply tax maps to assessors and otherwise to perform its duties in a timely manner."  Defs.' 7.1 Statement at ¶ 11; Pl.'s 7.1 Statement at ¶ 11.

On February 14, 1996, Plaintiff sent a memorandum to County Attorney Smith complaining

that Local Law No. 6 changed N.Y. REAL PROP. TAX LAW § 1532 in that it caused three tax map

technicians to be transferred from his office and further requesting Attorney Smith's opinion on the

changes since he believed they were inconsistent with the duties of his office under the New York

Real Property Tax Law.  Defs.' 7.1 Statement at ¶ 18; David A. Bagley Decl., dated Aug. 24, 2006,

Ex. E, Mem. to Smith, dated Feb. 14, 1996; Pl.'s 7.1 Statement at ¶ 18.  Then, on August 27, 1996,

Plaintiff wrote a letter to the New York State Office of Real Property Services ("ORPS").  Defs.'

7.1 Statement at ¶ 12; Bagley Decl., Ex. E, Lt., dated Aug. 27, 1996, with Attachs.; Pl.'s 7.1

Statement at ¶ 12.  This letter made reference to, and Plaintiff enclosed a copy of, the county law

and resolution as well as his memorandum to the county attorney.  Defs.' 7.1 Statement at ¶ 12; Pl.'s

7.1 Statement at ¶ 12.  Within this letter, Plaintiff stated that though some duties performed by the

tax map technicians remained the same, certain service related functions were no longer being used

and, furthermore, there was a "potential [to] severely restrict[] tax map and assessment file

maintenance[.]"  Defs.' 7.1 Statement at ¶¶ 12 & 19; Pl.'s 7.1 Statement at ¶¶ 12 & 19.

Subsequently, on January 25, 1999, Plaintiff sent a memorandum to former-County

Executive Henry Zwack detailing the duties of Plaintiff's office and asking those duties that were

transferred be reinstated as required by the New York Real Property Tax Law.  Defs.' 7.1 Statement

at ¶ 13; Bagley Decl, Ex. E, Lt. to Zwack, dated Jan. 25, 1999; Pl.'s 7.1 Statement at ¶ 13.  On

November 23 and 24, 1999, Plaintiff sent two memoranda to County Executive Zwack expressing

that, in his opinion, certain letters from assessors addressed the essence of Rensselaer County

violating Article 15 of the New York State Property Tax Law and the only resolution to the problem

was to restore the tax map positions to Plaintiff's departmental budget.  Defs.' 7.1 Statement at ¶¶

20 & 21; Bagley Decl., Ex. E, Mem. to Zwack, dated Nov. 23 & 24, 1999; Pl.'s 7.1 Statement at ¶¶

20 & 21.

On or about February 12, 1999, Plaintiff sent a letter to Zwack expressing discontent that personnel changes put the Bureau of Tax Services "in [an] untenable position[.]"  Defs.' 7.1 Statement at ¶ 24; Pl.'s 7.1 Statement at ¶ 24; Compl., Ex. X, Mem. to Zwack, dated Feb. 12, 1999. As a result of Plaintiff's evocation of his concerns, the objections to the transfer of the tax mapping functions and personnel changes became points of contention between Plaintiff and Zwack.  Defs.' 7.1 Statement at ¶ 22; Pl.'s 7.1 Statement at ¶ 22.  During this conflict and addressing Zwack's attacks on his job performance, Plaintiff sent a letter to Zwack defending the performance of his duties.  Defs.' 7.1 Statement at ¶ 23; Pl.'s 7.1 Statement at ¶ 23; Compl., Ex. V, Zwack Lt., dated Feb. 20, 2000.

Tax bills for the year 2000 were issued by an outside contractor and Plaintiff advised County Executive Zwack of problems that may result because of inadequate computer resources.  Defs.' 7.1 Statement at ¶ 14; Pl.'s 7.1 Statement at ¶ 14.  Plaintiff asserts that the transfer of tax mapping duties contributed to difficulties encountered in the issuance of the tax bills for the year 2000. Defs.' 7.1 Statement at ¶ 14; Pl.'s 7.1 Statement at ¶ 14.  Beginning in December 1999, the press got wind of the fact that trouble was brewing with the tax bills from Rensselaer County, namely that they failed to include penalties incurred by property owners.  *See generally* Compl., Ex. W, Articles. Thus, from late December 1999 into 2000 and beyond, a plethora of articles were published by the press.  *Id.*  These articles not only discussed the numerous problems associated with the late tax bills and penalties owed to the County, but within some of these articles Zwack began to personally attack Plaintiff for these problems.  *Id.*  In addition, several assessors' associates began expressing their views as to the situation regarding the tax bills as well as their opinion of Zwack's attack on

Plaintiff.  *Id.*  The articles further described Plaintiff's problem with the transfer of tax mappers and the tax mapping function that came as a result of Local Law No. 6 as well as other issues relating to Plaintiff's position.  *Id.*

While these articles were being published, Plaintiff sent several more letters and/or memoranda to Zwack and others regarding the tax bill issue, his personal reputation, and other related issues.  *Id.*, Exs. Z, Pl.'s Mem. to Zwack, dated Jan. 7, 2000; AA, Pl.'s Lt. to Swartz, dated Jan. 25, 2000; V, Pl.'s Lt. to Zwack, dated Feb. 20, 2000; BB, Pl.'s Lt. to Swartz, dated Mar. 2, 2000; DD, Pl.'s Mem. to Kathy Jimino, dated July 19, 2001; & EE, Pl.'s Lt. to Jimino, dated Aug. 21, 2001.  Among Plaintiff's many correspondences were letters sent to the County Legislature trying to get them to return the tax mapping function to his office.  Defs.' 7.1 Statement at ¶¶ 25 & 26; Bagley Decl., Ex. E, Lt. to Swartz, dated Jan. 4, 2000, Lt. to Swartz, dated Jan. 25, 2000, Lt. to Swartz, dated Mar. 2, 2000, & Lt. to Swartz, dated Apr. 28, 2000; Pl.'s 7.1 Statement at ¶¶ 25 & 26.

Subsequently, and while articles were still being published and Plaintiff was still writing letters/memoranda, in May 2001 Zwack resigned as County Executive.  *See* Dkt. Nos. 25 & 41, Henry Zwack Dep., dated June 2, 2004, at p. 4, lines 6-10; Kathy Jimino Dep., dated June 1, 2004, at p. 10, lines 13-23.  Upon the resignation in May 2001, Kathy Jimino became the County Executive.  Jimino Dep. at p. 19, lines 10-11.  During this transition, Plaintiff remained the Director of Tax Services though his term was set to expire on the last day in September 2001.  *Id.* at p. 30, lines 17-18; Pl.'s Dep., dated July 27, 2004, at p. 10, lines 8-13.  However, because certain events limited Jimino's time to make a decision on Plaintiff's reappointment, Plaintiff stayed on as "interim" Director until March 1, 2002, when the decision was finally made not to reappoint Plaintiff.  Jimino Dep. at p. 30, lines 17-24, p. 49, lines 7-13, p. 51, lines 21-24, & p. 52, lines 1-16;

Pl.'s Dep. at p. 12, lines 6-24, & p. 13, lines 1-18.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in

deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## B. First Amendment Claim

Plaintiff claims that his First Amendment right to free speech was violated when Defendants failed to reappoint him as the Director of the Bureau of Real Property Tax Services in retaliation for expressing his views on the legality and propriety of Rensselaer County Local Law No. 6.  Compl. at ¶¶ 128-41; Dkt. No. 41, Pl.'s Mem. of Law at pp. 11-19.  Defendants assert that no First Amendment violation occurred as Plaintiff did not speak out as a citizen, but instead spoke out pursuant to his official duties as an employee of the County of Rensselaer.  Dkt. No. 38, Defs.' Mem. of Law at pp. 4-8.

The Supreme Court has long stated that "public employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, ___ U.S. ___, 126 S. Ct. 1951, 1957 (2006) (citing *Pickering v. Bd.*

*of Educ.*, 391 U.S. 563, 568 (1968) & *Connick v. Myers*, 461 U.S. 138, 147 (1983)) (further citations omitted).  However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960; *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 105 (2d Cir. 2006).  This is so because "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity.  Official communications have official consequences, creating a need for substantive consistency and clarity . . . [and s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti v. Ceballos*, 126 S. Ct. at 1961.

 Notwithstanding, if the public employee is speaking as a citizen and not pursuant to his official duties, the Second Circuit has stated that "although a governmental entity enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their speech on matters of public importance." *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 211 (2d Cir. 2002); *see also Skehan v. Village of Mamaroneck*, 465 F.3d at 105-06 (quoting *Munafo*).  If a person is not speaking out pursuant to official duties but rather as a private citizen, then the court must determine, as a question of law, whether the speech is a matter of public concern. *Skehan v. Village of Mamaroneck*, 465 F.3d at 106 (citing *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005)).

 Accordingly, in order to for a plaintiff to establish a First Amendment retaliation claim, the plaintiff must prove that:

> (1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[]
> on a matter of public concern; (2) [he] suffered an adverse employment action; and (3)
> the speech was a 'motivating factor' in the adverse employment decision.

*Skehan v. Village of Mamaroneck*, 465 F.3d at 106 (citing *Gronowski v. Spencer*, 424 F.3d at 292 &
*Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996) for the proposition that the speech must be
"at least a substantial or motivating factor")) (further citation omitted).

A plaintiff must also make a showing that each defendant "was personally involved . . . in the

alleged constitutional deprivations." *Id.* (quoting *Gronowski v. Spencer*, 424 F.3d at 293).  If a

plaintiff can establish the requisite burden, a defendant employer may still prevail by showing by a

preponderance of the evidence that either "(1) the defendant would have taken the same adverse

action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was

likely to disrupt the [defendant's] activities and that the harm caused by the disruption outweighs

the value of the plaintiff's expression."  *Id.* (citing *Cobb v. Pozzi*, 352 F.3d 79, 91 (2d Cir. 2003)).

In determining whether the speech was pursuant to a plaintiff's official duties, the Supreme

Court has noted that a court must make a practical inquiry into the situation as "[f]ormal job

descriptions often bear little resemblance to the duties an employee actually is expected to perform,

and the listing of a given task in an employee's written job description is neither necessary nor

sufficient to demonstrate that conducting the task is within the scope of the employee's professional

duties for First Amendment purposes." *Garcetti v. Ceballos*, 126 S. Ct. at 1961-62.

If the speech is not pursuant to a plaintiff's official duties and it is determined that the

plaintiff was instead speaking out as a citizen, the Court must determine whether the speech was a

matter of public concern, which can be "fairly considered as relating to any matter of political,

social, or other concern to the community." *Connick v. Meyers*, 461 U.S. at 146; *see also Benvenisti*

*v. City of New York*, 2006 WL 2777274, at *10 (S.D.N.Y. Sept. 23, 2006) (stating that public

corruption, wrongdoing, allegations of racial discrimination, mismanagement of public funds, and criticism of the federal government's national drug control policy could be matters of public concern (citations omitted)).  Notwithstanding, "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment," fall outside the realm of constitutional protection. *Lewis v. Cowen*, 165 F.3d 154,164 (2d Cir. 1999) (quoted in *Benvenisti v. City of New York*, 2006 WL 2777274, at *10).  In order to determine whether speech involves matters of public concern, a practical inquiry into the "content, form, and context of a given statement, as revealed by the whole record[]" must be done. *Connick v. Myers*, 461 U.S. at 147-48.

Here, when Plaintiff took his oath as Director of the Bureau of Tax Services, he stated that he would "support the Constitution of the United States and the Constitution of the State of New York[.]" Comp., Ex. M, Oath.  The term of this position was to expire on September 30, 2001. *Id.* The scope of Plaintiff's duties as a Director are promulgated in an opinion of counsel for the Office of Real Property Services and N.Y. REAL PROP. TAX LAW § 1532. *Id.*, Ex. A, Opinion SBRPS No. 2, dated May 26, 1994 (Reissued May 1995).  The opinion of counsel concurred with those duties stated within N.Y. REAL PROP. TAX LAW § 1532. *Compare id. with* N.Y. REAL PROP. TAX LAW § 1532.

In 1995, Rensselaer County passed Local Law No. 6, which transferred some personnel as well as tax mapping services away from Plaintiff's office.  Defs.' 7.1 Statement at ¶¶ 11 & 18; Pl.'s 7.1 Statement at ¶¶ 11 & 18.  On February 14, 1996, Plaintiff sent a letter to Robert Smith, Rensselaer County Attorney, seeking his opinion and recommendation regarding Plaintiff's concerns over the transfer of three tax map technicians and Local Law No. 6.  Compl., Ex. N, Smith Lt., dated Feb. 14, 1996.  Plaintiff subsequently, on August 27, 1996, sent a letter to Richard

Sinnott, Counsel in the New York State Office of Real Property Services, providing information regarding the transfer of tax map technicians and his consternation over the matter. *Id.*, Ex. O, Sinnott Lt., dated Aug. 27, 1996. The next year, on March 10, 1997, Shirley Degnan, then-President of the Rensselaer County Assessors' Association ("RCAA"), wrote to County Executive Henry Zwack regarding her concerns that the tax map unit, which was transferred in January 1996 to the Bureau of Research and Information Services, caused a decline in the level of services that RCAA had been receiving from the unit. *Id.*, Ex. G, Degnan Lt., dated Mar. 10, 1997. Due to an eight to twelve month backlog of updated tax maps, she urged that the tax mapping function be returned to the Bureau of Tax Services. *Id.*

After some time had passed, on January 25, 1999, Plaintiff sent a memorandum to Zwack, referencing a letter from the RCAA as well as a conversation with Thomas Griffen, Executive Director of ORPS, stating that he believed the tax mapping function was extremely important and that this function should be returned to the Bureau of Tax Services so that the Bureau could comply with the New York Real Property Tax Law. *Id.*, Ex. P, Zwack Mem., dated Jan. 25, 1999. On February 12, 1999, Plaintiff submitted another memorandum to Zwack regarding the loss of certain employees and the necessity to quickly correct the problems due to the fact that assessment rolls were to be produced approximately a month and a half after the date of the memorandum. *Id.*, Ex. X, Zwack Mem., dated Feb. 12, 1999. On April 27, 1999, Plaintiff sent his third memorandum to Zwack. *Id.*, Ex. Y, Zwack Mem., dated Apr. 27, 1999. The reason for this memorandum was that Plaintiff's office experienced problems with the operation of the computer network, which was utilized to complete the tentative tax roll that would be provided to the towns. *Id.* This tax roll was to be available for public inspection prior to the grievance day, which typically occurred on the

*-12-*

fourth Tuesday in May.  *Id.*  However, due to the computer network's inoperability, no assessment

rolls were printed up until the date of the memo and input of the crucial information from certain

towns was incomplete.  *Id.*  Thus, by his memorandum, Plaintiff asked Zwack for help.  *Id.*

On June 11, 1999, Plaintiff received a letter from Garth Slocum, then-President of the

RCAA, detailing the serious problems experienced by the assessors because of the computer

network failures and disintegration of services.  *Id.*, Ex. I, Slocum Lt., dated June 11, 1999.  This

letter was sent to many individuals and as a result, Joseph Cybulski, Deputy County Executive,

responded to the concerns of Mr. Slocum wherein he stated that the County was attempting to deal

with the problems and hoped to have them resolved.  *Id.*, Ex. J, Cybulski Lt., dated June 21, 1999.

On June 24, 1999, correspondence between Thomas Griffen and Thomas Frey, Executive Secretary

of the New York State Assessors' Association ("NYSAA"), were exchanged in response to the

problems.  *Id.*, Ex. H, Griffen Lt., dated June 24, 1999.

On October 5, 1999, a letter was interchanged between Vincent O'Connor from ORPS and

Mr. Cybulski regarding the possible return of those functions transferred from the Bureau of Tax

Services by the County.  *Id.*, Ex. Q, O'Connor Lt., dated Oct. 5, 1999.  Because of this letter, on

November 1, 1999, Plaintiff sent Neil Kelleher, Chairman of the Rensselaer County Legislature, a

memorandum referencing the October 5th letter in which he expressed delight that the services may

be returned to his office.  *Id.*, Ex. R, Kelleher Mem., dated Nov. 1, 1999.  On November 23, 1999,

Plaintiff sent a memorandum to Zwack stating that certain letters from assessors regarding the New

York State Property Tax Law and the Rensselaer County Local Law were right on point and that the

tax map positions should be restored to Plaintiff's departmental budget.  Bagley Decl., Ex. E, Mem.

to Zwack, dated Nov. 23, 1999.  On November 24, 1999, Plaintiff sent another memorandum to

Zwack reiterating his position that the tax mapping function and personnel should be returned to his office. *Id.*, Ex. E, Mem. to Zwack, dated Nov. 24, 1999. Subsequently, on December 13, 1999, Frey, on behalf of the NYSAA, wrote a letter to the RCAA stating that it had been informed of the tax mapping situation since approximately May 1999 and that they concurred with and strongly supported the request that the tax mapping duties be returned to Plaintiff. Compl., Ex. F, Frey Lt., dated Dec. 13, 1999. Mr. Frey added in the letter that Plaintiff had the support of fellow County Directors, the RCAA, ORPS, and the NYSAA. *Id.*

Apparently no change in Local Law No. 6 occurred so correspondence between Plaintiff, Zwack, Griffen, O'Connor, Edward Swartz, Chairman of the Budget and Finance Committee, Attorney Smith, the RCAA, and others continued for a number of years regarding Local Law No. 6, N.Y. REAL PROP. TAX LAW § 1532 and corresponding concerns, all culminating in the publication of many news articles describing the feud between Zwack and Plaintiff as well as the issues raised by Plaintiff regarding the transfer of personnel and tax mapping functions. *Id.*, Exs. S, Griffen Mem., dated Dec. 20, 1999; Z, Pl.'s Mem. to Zwack, dated Jan. 7, 2000; K & L, RCAA Resolutions, dated Jan. 20 & 25, 2000; AA, Pl.'s Lt. to Swartz, dated Jan. 25, 2000; U, Zwack Lt. to Pl., dated Feb. 9, 2000; V, Pl.'s Lt. to Zwack, dated Feb. 20, 2000; D, Lt. to Gruenberg, dated Feb. 24, 2000; BB, Pl.'s Lt. to Swartz, dated Mar. 2, 2000; CC, Smith Lt., dated Mar. 2, 2000; DD, Pl.'s Mem. to Kathy Jimino, dated July 19, 2001; EE, Pl.'s Lt. to Jimino, dated Aug. 21, 2001; W, Articles; *see also* Bagley Decl., Ex. E, Lt. to Swartz, dated Jan. 4, 2000, & Lt. to Swartz, dated Apr. 28, 2000. In December 2001, the Troy Record printed an article entitled "Jackson is being dropped as head of the Department of Tax Services," which noted the troubles Plaintiff encountered with Zwack over the Local Law and how Kathy Jimino, the new County Executive, had not decided on

Plaintiff's reappointment.  Compl., Ex. FF, Jamie D. Gilkey, *Jackson is Being Dropped as Head of the Department of Tax Services*, THE TROY RECORD, Dec. 2001.

In determining if the three elements of retaliatory speech have been established, the Court must first ascertain whether Plaintiff was speaking pursuant to his official duties.  *See Garcetti v. Ceballos*, 126 S. Ct. at 1960; *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006). As noted previously, if Plaintiff was speaking pursuant to his official duties, the Constitution would not insulate Plaintiff's communications and a First Amendment retaliation claim would not hold. *See Garcetti v. Ceballos*, 126 S. Ct. at 1960.  However, if Plaintiff's speech fell outside of his official duties and Plaintiff could show that the other elements of a First Amendment claim are present, the Court would have to examine Defendants' defenses to the action taken.  *See Skehan v. Village of Mamaroneck*, 465 F.3d at 106.

Here, in a previous Motion for Summary Judgment, the issues of public concern, adverse employment action, causal connection, and Defendants' defenses have been addressed.  *See supra* n. 1; Dkt. Nos. 27, Minute Entry, dated May 20, 2005, & 28, Hr'g Tr., dated May 19, 2005.  The Honorable Gary L. Sharpe, United States District Judge, upon hearing oral argument from the parties, found that: 1) Plaintiff's speech qualifies as an issue of public concern; 2) the failure to reappoint Plaintiff based on protected speech constitutes an adverse employment action; 3) an issue of fact exists as to whether there was a causal connection between the protected First Amendment activity and adverse employment action; and 4) an issue of fact exists as to the reason Defendants did not reappoint Plaintiff.  Hr'g Tr. at p. 25, line 25, p. 26, lines 1-25, & p. 27, lines 1-11 (citing, *inter alia*, *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 n. 4 (2d Cir. 2001) (public concern) & *Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972) (adverse employment action)).

It is incumbent upon this Court to accept these rulings made by Judge Sharpe pursuant to the "law of the case" doctrine.  The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) (quoting *Dilaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992)) (further citations omitted).  Absent cogent or compelling reasons, including an intervening change of controlling law, availability of new evidence, or to correct or prevent a clear manifest injustice, the law of the case governs and should not be departed from.  *DiLaura v. Power Auth. of the State of New York*, 982 F.2d 73, 76 (2d Cir. 1992); *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983); *see also United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  Only those questions actually decided become law of the case.  *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979).  Here, the Court finds no reason to disturb the determinations made by Judge Sharpe nor do the parties propose any reason to do so.  *See generally* Pl.'s Mem. of Law at pp. 1-2; Defs.' Mem. of Law.  Therefore, in light of the additional element added by *Garcetti*, the Court will now turn to the question of whether Plaintiff spoke pursuant to his official duties.

Although formal descriptions of Plaintiff's duties are in no way dispositive of the question as to whether Plaintiff's speech was made pursuant to his official duties, the Director of Real Property Tax Services, the title held by Plaintiff, by statute, shall provide the following services:

> 1. . . . (a) [p]repare tax maps, maintain them in current condition, and provide copies thereof . . .; (b) [p]rovide advisory appraisals to cities and towns . . .; (b-1) [p]rovide appraisals and appear as an expert witness or designate qualified personnel within the office of real property tax services to appear as expert witnesses in court proceedings for cities and towns . . .; (c) [a]dvise the assessors on procedures for the preparation and maintenance of assessment rolls, property record cards, appraisal cards and other records and documents relating to real property assessment and taxation; (d) [p]rovide appraisal

cards in such form as shall be prescribed by the state board in quantity needed for use in the preparation of assessment records; (e) [c]ooperate and assist in the training programs provided by the state board . . .; (f) [p]rovide administrative support, cooperation and assistance to acting boards of assessment review constituted . . . .

2. The director of real property tax services shall in addition:  (a) [p]rovide the county equalization agency with such information from his office as may be useful in the operation of that agency; (b) [c]oordinate any county-wide revaluation program; (c) [p]repare and furnish an annual report to the legislative body of the county, a copy of which shall be sent to the state board which report shall contain at least such information required by the legislative body of the county and the state board and prepare such additional reports as may from time to time be required by the legislative body of the county or the state board; (d) [p]rovide to the county clerk, upon request, the tax map identification numbers of all parcels identified by the clerk as within an agricultural district; (e) [i]dentify to the county clerk by tax identification number, those parcels within the county which have received agricultural assessments within the past year; (f) [s]erve on any county agriculture and farmland protection board established in the county.

3. The director of real property tax services shall when authorized by resolution of the county legislative body:  (a) [a]ssist in the disposition and sale of real property acquired by the county as a result of tax sale; (b) [p]erform the duties imposed upon the recording officer of the county . . . in relation to reports of transfers of real property; (c) [s]upply cities and towns with assessment rolls or other forms for use in connection with the preparation of assessment rolls or the collection of property taxes; (d) [s]upervise the appraisal of property and the preparation of assessment rolls for those assessing units which have entered into agreements with the county . . .[;] (e) [p]erform or supervise the performance of data collection, sales verification, or other assessment-related services, pursuant to an agreement between the county and an assessing unit or the state board.

4. The director of real property tax services shall render such other related services pertaining to the assessment and taxation of real property as may be authorized by the legislative body of the county as are not inconsistent with the performance of his duties pursuant to this chapter or any general or special law.

N.Y. REAL PROP. TAX LAW § 1532.

In further analyzing this issue, the Supreme Court has stated that

[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. . . . [However, w]hen a public employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to speech by citizens who are not government employees.

*Garcetti v. Ceballos*, 126 S. Ct. at 1961.

Beginning in February 1996 until the end of 1999, Plaintiff sent several letters and/or memoranda to Zwack, the County Attorney, and others. *See* Compl., Exs. N, Smith Lt., dated Feb. 14, 1996; O, Sinnott Lt., dated Aug. 27, 1996; P, Zwack Mem., dated Jan. 25, 1999; X, Zwack Mem., dated Feb. 12, 1999; & Y, Zwack Mem., dated Apr. 27, 1999; Bagley Decl., Ex. E, Mem. to Zwack, dated Nov. 23, 1999, & Mem. to Zwack, dated Nov. 24, 1999.  By these correspondences, Plaintiff pronounced his opinion regarding the passage of Local Law No. 6, which changed the dynamics of his statutory duties.  Those correspondences were all prepared on Plaintiff's official letterhead and pertained to issues directly affecting the performance of his duties, including preparing and maintaining tax maps, providing administrative support to assessors, and retaining employees that were within his office.  Plaintiff believed, as part of the oath he took, that as Director of the Bureau of Tax Services, it was his duty to support the Constitution of the United States and the Constitution of the State of New York.  As a result, he stated on numerous occasions to several people that Local Law No. 6 was inconsistent with the New York Real Property Tax Law.

Additionally, as Plaintiff's formal job description states, he was to provide any other related services that pertained to the assessment and taxation of real property that was authorized by the county legislature and which was not inconsistent with the performance of his duties. *See* N.Y. REAL PROP. TAX LAW § 1532.  Even though there is no mention in the statute that Plaintiff was to provide and/or send any reports, memoranda, or letters of concern or dissatisfaction on matters that were pertinent to his official duties, that is not to say that it could not be part of his duties since, as noted previously, formal job descriptions are neither necessary nor sufficient to demonstrate that conducting the task is within the scope of an employee's professional duties.  Thus, as the Director, it would seem logical that if a problem arose in the course of performing his duties prescribed by

statute, Plaintiff would have to inform either the county executive or legislature.

Though writing these letters and/or memoranda were not a part of his formal job description, this Court nonetheless finds that, under the Supreme Court's guidance that a practical inquiry must be made into one's job description, these correspondences from 1996 until 1999 were issued pursuant to his overall official and managerial duties as Director of Real Property Tax Services.  *See generally McGuire v. Warren*, 2006 WL 3456538, at *1 (2d Cir. Nov. 30, 2006) (noting that internal administrative matters did not in and of itself create an interest to the community at large and that since the allegations stated plaintiff was acting pursuant to her official duties when the speech occurred, judgment against plaintiff was proper).[4]  Thus, Plaintiff cannot sustain a First Amendment retaliation claim from 1996 until 1999.

However, at the very end of December 1999 into the early months of the following year and so forth, certain events took place that cast doubt as to whether Plaintiff was still speaking pursuant to his official duties or whether his role transmuted to that of a private citizen speaking on a matter of public concern.  On December 29, 1999, an article was published entitled "Clock ticking on tax bills."  Compl., Ex. W, Cathy Woodruff, *Clock Ticking on Tax Bills*, TIMES UNION, Dec. 29, 1999.  This article detailed the problems county and town officials were having in getting property tax bills prepared on time.  *Id.*  Plaintiff was quoted as saying "[i]t's going to take something of a 'Miracle on Seventh Avenue' to get everything done by year's end[.]"  *Id.*  Plaintiff attributed the delay to a number of factors, including switching to an outside contractor for computerized tax roll

---

[4] The Court notes that this opinion is unpublished. The Court further notes that in *McGuire v. Warren*, the Second Circuit gave the plaintiff an opportunity to amend her complaint to include allegations that she spoke as a citizen in light of *Garcetti*, thus vacating and remanding the matter.  In the case at hand, the parties were given ample opportunity to brief the issues in light of *Garcetti*.

maintenance and bill preparation work. *Id.* The article further noted that if the tax bills were not mailed on time, property owners would have less time to pay their bills before penalties would accrue. *Id.*

On January 7, 2000, an article in the Troy Record was released which stated that "[i]n an unprecedented error[,]" Rensselaer County sent out their tax bills without including late penalties due to the County. *Id.*, Ex. W, Jamie D. Gilkey, *Tax Bills Fail to Include Late Charges*, THE TROY RECORD, Jan. 7, 2000. The article stated that Zwack and his staff were investigating whether the Bureau of Tax Services or the private company hired to print the bills were responsible for the mistakes. *Id.* The same day, the Times Union printed an article entitled "Halt reorganization, top tax official urges," which focused on Plaintiff and other town assessors asking the Rensselaer County Legislature to "scrap . . . [the] reorganization of the Real Property Tax Service," which they claimed in some form resulted in the delayed distribution of local tax bills. *Id.*, Ex. W, Cathy Woodruff, *Halt Reorganization, Top Tax Official Urges*, TIMES UNION, Jan. 7, 2000. The article referenced a memorandum sent to Swartz by Plaintiff in which Plaintiff noted the tax mappers were moved into BRIS and that the County was violating the Real Property Tax Law. *Id.* The article further noted that Plaintiff referred to Zwack's plan "to trade tax services office space with . . . the county Personnel office . . . [as] inappropriate for his operation." *Id.* Within the same article, Zwack attacked the "expertise" of county department heads in assessing where the tax mapping function and personnel should be located. *Id.* Other assessors and Griffen weighed in on the subject as well. *Id.* The same day these articles were published, on January 7, 2000, Plaintiff wrote a letter to Zwack notifying him that he became aware of the problems with the tax bills and that he

was investigating the matter.  *Id.*, Ex. Z, Pl.'s Mem. to Zwack, dated Jan. 7, 2000.[5]

On January 8, 2000, the Times Union printed an article regarding "flawed" tax bills and, though there was no quote from Plaintiff, Zwack was quoted as saying that he believed the tax bill problems were the fault of Plaintiff "failing to accurately calculate the amount due on each bill." *Id.*, Ex. W, Cathy Woodruff, *County Issues Flawed Tax Bills*, TIMES UNION, Jan. 8, 2000. Subsequently, on January 11, 2000, another article in the Troy Record stated the problems with the tax bills continued and Plaintiff was being blamed for the mistakes with the bills.  *Id.*, Ex. W, Jamie D. Gilkey, *Tax Blunder Mounts*, THE TROY RECORD, Jan. 11, 2000.  The article cited to a confidential letter sent by Plaintiff to Zwack on January 7, 2000, regarding the change in procedures with BRIS.[6]  *Id.*

Then on January 12, 2000, the Times Union printed an article regarding the previously inadequate tax bills that were sent out.  *Id.*, Ex. W, Cathy Woodruff, *Delinquent Tax Re-Billing Approved*, TIMES UNION, Jan. 12, 2000.  The article discussed supplemental tax bills to be sent out to property owners and that Plaintiff told legislators he was in contact with the private company issuing the bills and would find out how quickly they could be printed.  *Id.*  Citing to a memo written by Plaintiff, the article stated Plaintiff regretted that bills were not double checked to which Zwack was quoted in stating that all these problems were "clear evidence that Jackson is to blame for the error." *Id.*  A second article also appeared in the Times Union the same day wherein Zwack stated that because of the error on the tax bills, there would be no change in Local Law No. 6.  *Id.*,

---

[5] The Court notes that this letter does not appear to be written on official letterhead.  *See* Compl., Ex. Z, Pl.'s Lt. to Zwack, dated Jan. 7, 2000.

[6] Another article was published in the Troy Record on January 11, 2000 regarding mistakes in tax bills in North Greenbush.  Compl., Ex. W, Jamie D. Gilkey, *Property Tax Bills Stall in North Greenbush*, THE TROY RECORD, Jan. 11, 2000.

Ex. W, Cathy Woodruff, *Director Erred, Zwack Asserts*, TIMES UNION, Jan. 12, 2000.  Zwack again

placed blame on Plaintiff stating that the mistakes on the tax bills were due to the failure of the

Director.  *Id.*  On January 17, 2000, a scathing editorial was published regarding Zwack's behavior

as County Executive and how Zwack "characteristically blam[ed] a career civil servant named Jeff

Jackson" for problems occurring in the County.  *Id.*, Ex. W, Fred LeBrun, Editorial, *Inspector*

*Zwack's Cuban Caper*, TIMES UNION, Jan. 17, 2000.  Subsequently, on January 25, 2000, two

articles were printed in the Times Union.  *Id.*, Ex. W, Cathy Woodruff, *Towns Want Own Mapping*

*System*, TIMES UNION, Jan. 25, 2000, & Cathy Woodruff, *Assessors Group Backs Tax Services*

*Supervision*, TIMES UNION, Jan. 25, 2000.  The first article was from the assessors point of view

regarding the computer network maintained by Rensselaer County.  *Id.*, Ex. W, *Towns Want Own*

*Mapping System*.  Plaintiff responded to the assessors by stating "[r]ight now, we're trying to

reassemble and repair something that we can feel good about again[.]"  *Id.*  He went on to state that

he was not giving up on the network, but that the network was "only as good as the people who

operate and maintain it."  *Id.*  The second article pertained to the RCAA's endorsed proposal to

return the tax mappers back to the office of Plaintiff and explained how the RCAA hoped the

proposal would be approved by the County Legislature.  *Id.*, Ex. W, *Assessors Group Backs Tax*

*Services Supervision*.  On the same day, January 25, 2000, Plaintiff wrote a letter to Chairman

Swartz regarding some of the issues described within the articles, including the transfer of tax

mappers, the legality of Local Law No. 6, computer problems at BRIS, and Plaintiff's reputation.

*See id.*, Ex. AA, Pl.'s Lt. to Swartz, dated Jan. 25, 2000.

On January 26, 2000, an editorial was published in the Times Union regarding the RCAA's

distress over the removal of the tax mappers from Plaintiff's office.  *Id.*, Ex. W, Cathy Woodruff,

Editorial, *Assessors Rate a Taxing Lesson in Politics of the County*, TIMES UNION, Jan. 26, 2000. The editorial detailed how the assessors began "pleading publicly" for the return of the tax mappers to Plaintiff's office after Zwack blamed Plaintiff for the tax bill errors. *Id.*  One of the assessors stated in the editorial that he expressed to Plaintiff that Zwack "made [him] the target and [Zwack] doesn't understand that [Plaintiff is] expressing [the assessors'] concerns[.]" *Id.*  Thereafter, on February 4, 2000, another newspaper printed an article stating that Republicans in the Rensselaer County Legislature were asking Zwack to return the tax mappers back to Plaintiff's office. *Id.*, Ex. W, Jamie D. Gilkey, *Lawmakers Address Tax Issue*, THE TROY RECORD, Feb. 4, 2000.  The article described how Zwack has "publicly questioned whether Jackson was performing his duties properly when more than 3,000 erroneous tax bills were sent to property owners[.]" *Id.*  It also noted that Zwack's administration had attempted to forward a resolution specifically holding Plaintiff's office responsible for the errors but that the measure was ultimately amended to "delete Jackson's name" before being approved by the Legislature. *Id.*

Subsequently, on February 20, 2000, Plaintiff wrote a detailed letter to Zwack. *Id.*, Ex. V, Pl.'s Lt. to Zwack, dated Feb. 20, 2000.  This letter seemed to rebut statements made in the press regarding Plaintiff's "'cavalier attitude' toward[s his] responsibilities" and addressed issues of the errors in the tax bills as well as numerous complications with BRIS.  *Compare id. with* Ex. W, *Halt Reorganization, Top Tax Official Urges*, *County Issues Flawed Tax Bills*, *Tax Blunder Mounts*, *Delinquent Tax Re-Billing Approved*, *Director Erred, Zwack Asserts*, & *Lawmakers Address Tax Issue*.  Plaintiff further attempted to bolster his reputation by reiterating that he had been the Director for eight and one half years and that Plaintiff had provided written notification to Zwack on several occasions of the serious problems he was encountering. *Id.*, Ex. V, Pl.'s Lt. to Zwack, dated

Feb. 20, 2000.  Then on March 2, 2000, Plaintiff wrote a letter to Swartz to ingeminate his position

that the tax mapping and tax mapping maintenance functions were his statutory responsibilities and

not that of BRIS.  *Id.*, Ex. BB, Pl.'s Lt. to Swartz, dated Mar. 2, 2000.  Plaintiff further stated that he

would discuss the matter with the legislature at any time.  *Id.*

Thereafter, on March 22, 2000, yet another article was printed in the Times Union regarding

a request to return the tax mappers and tax mapping functions to Plaintiff's office.  *Id.*, Ex. W,

Cathy Woodruff, *Rethink Tax Mappers Shift, County Told*, TIMES UNION, Mar. 22, 2000.  The

article states that Griffen, Director of ORPS, hoped that the agency could amicably resolve with the

Legislature the issue of transferring the tax mappers back to Plaintiff's office.  *Id.*  However, the

article went on to comment that the Legislature had no plans to reverse Local Law No. 6 and County

Attorney Smith reiterated that position.  *Id.*

Kathy Jimino became County Executive in May 2001.  A short time later, Plaintiff sent two

letters to Jimino on July 19 and August 21, 2001, touching upon issues previously discussed by the

press, mainly the tax mapping functions as well as Plaintiff's qualifications for his position.  *Id.*,

Exs. DD, Pl.'s Mem. to Kathy Jimino, dated July 19, 2001; & EE, Pl.'s Lt. to Jimino, dated Aug. 21,

2001.  Then, approximately three months past the date Plaintiff's term as Director expired, the Troy

Record published an article stating that Plaintiff was not expected to be reappointed as Director.  *Id.*,

Ex. FF, Jamie D. Gilkey, *Jackson is Being Dropped as Head of the Department of Tax Services*,

THE TROY RECORD, Dec. 2001.  However, Jimino was quoted as saying "[w]e haven't decided on

reappointment yet . . . and he still serves in that position until a decision is made on it."  *Id.*

Notwithstanding, the article went on to describe the "public spat" between Plaintiff and former

County Executive Zwack and the extensive press coverage relating to the battle over the tax

mappers. *Id.*

At the time the letters were written to Zwack, Swartz, and Jimino beginning in 2000, the issues described within these documents were in the public realm and garnered the attention of the press. The Court does note that though all but the January 7th letter to Zwack were written on official letterhead, that fact is not dispositive in determining if Plaintiff was in fact continuing to speak pursuant to his official duties. *Garcetti v. Ceballos*, ___ U.S. ___, 126 S. Ct. 1951, 1959 (2006). After December 1999, in responding to the public discussion on the failure of computers, the late filing of the tax bills, which may have also been inaccurate, and Zwack's public attack upon his character and ability to manage the Bureau of Tax Services, Plaintiff's speech may have been transformed by these events into speech by a private citizen, thus possibly drawing him into making comments outside his official duties.

As noted previously, the Supreme Court observed that a public employee's statements spoken pursuant to his official duties does not garner the protection of the First Amendment in that an employer has a heightened interest in controlling a public employee's speech made in his professional capacity since the communications of these public officials may have official consequences. *Garcetti v. Ceballos*, 126 S. Ct. at 1961. Accordingly, the employee's supervisors must be able to make certain that an employee's "official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* Furthermore, there would be no relevant analogue to speech by private citizens when the public employee speaks out about his employment responsibilities. *Id.* However, the employer's interest in controlling a public employee's speech is in no way absolute. *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 211 (2d Cir. 2002); *see also Skehan v. Village of Mamaroneck*, 465 F.3d 96, 105-06 (2d Cir. 2006). A

public employee may still retain his First Amendment rights if he makes public statements that fall

outside the course of performing his official duties. *Garcetti v. Ceballos*, 126 S. Ct. at 1961. This

is so because it is precisely the kind of activity engaged in by private citizens who do not work for

the government. *Id.*

Because of a confluence of a number of factors, our dilemma is determining whether

Jackson was speaking pursuant to his employee responsibilities or as a private citizen. As observed

in *Garcetti*, "conducting these inquires [have] prove[n] difficult [because] of the enormous variety

of fact situations in which critical statements by . . . public employees may be thought by superiors .

. . to furnish grounds for dismissal." *Id.* at 1958 (citation omitted). In *Garcetti*, Ceballos was a

deputy district attorney who claimed retaliatory action was taken against him after he wrote a

disposition memorandum regarding possible governmental misconduct in which he recommended

dismissal of a criminal case. *Id.* at 1955-61. Ceballos believed that an affidavit used to obtain a

search warrant was based upon serious misrepresentations and he conducted an investigation into

the matter. *Id.* at 1959. Although Ceballos relayed these concerns to his supervisors in the

memorandum, the prosecution of the criminal case went forward and subsequently, Ceballos was

transferred from his calendar deputy position to a trial deputy position, transferred to another

courthouse, and denied a promotion. *Id.* at 1956. The Supreme Court stated, however, that

"Ceballos did not act as a citizen when he went about conducting his daily professional activities,

such as supervising attorneys, investigating charges, and preparing filings[,]" and therefore, he did

not speak as a citizen when he wrote the memo suggesting dismissal of the criminal case. *Id.* at

1960. The Court concluded that "Ceballos wrote his disposition memo because that is part of what

he, as a calendar deputy, was employed to do[,]" and as such, he was acting as a government

*-26-*

employee. *Id.* at 1960-61.  More importantly, there was no dispute that the writing of the memorandum was part of Ceballos' duty as a calendar deputy.  *Id.* at 1960.[7]

Here, based upon the record presented, that being the parties' dispute of the facts regarding the scope of his official capacity and Jackson's dispute that these public statements were made in his official capacity, we cannot say that there is no material and genuine issue of fact.  Notwithstanding the parties' dispute, the facts and events after 1999 are more blurred, or convoluted, than those between 1995 to 1999, which are so much more apparent to us as speech within his official duties.  We are unable to tell, as readily as we were able to with his missives to the County Executive and the New York State personnel during 1995 to 1999, that his responses to the press were practically within the domain of his official chores or a knee-jerk reaction to the public tirade leveled against him by Zwack.  In some instances, it seems that Jackson appears to be the public concern, not the tax bills, and defending yourself publicly may cross over into a private citizen sphere.  And, it may be the total public dialogue that may satisfy the causal connection to the materially adverse employment action of no reappointment after twenty-six years of service with the Department of Tax Services.  Furthermore, according to Plaintiff, Jimino had stated to him that the reason he would not be reappointed was because she had a "gut feeling" that things were not going to work out.  Pl.'s Dep. at p. 13, lines 19-24.

Based upon a review of this record we are left with too many questions and thus there is a presence of a material issue of fact:  Was Jackson drawn into the public debate on the tax bills in his official capacity or as a knowledgeable private citizen?  Was he contributing to the civic discourse

---

[7] The Supreme Court further noted that neither the subject matter, *i.e.* subjects relating to the speaker's job, nor the place of the expressions are dispositive of whether Ceballos was speaking pursuant to his official duties.  *Garcetti v. Ceballos*, 126 S. Ct. at 1959.

on this major public concern for Rensselaer County outside the scope of his official obligations?
When Jackson's competence and character was being publicly impugned by Zwack, didn't he have
the right to defend himself as a private citizen and publicly at that?  In some situations, as here
especially after 1999, the delineation is not truly black or white.  As so eloquently noted in *Garcetti*,
"[w]e . . . have no occasion to articulate a comprehensive framework for defining the scope of an
employee's duties in cases where there is room for serious debate . . . [and w]e reject . . . that
employers can restrict employees' rights by creating excessively broad job descriptions."  *Id*. at
1961.

As comprehensive as *Garcetti* is, we are still left without a standard or a guide to help us
balance or maneuver through those public statements that may be mixed, or rather disguised because
the scope of job responsibilities are not so manifest.  Thus, as the Court cannot definitively state that
Plaintiff was speaking pursuant to his official duties, a question of fact remains as to Plaintiff's
speech beginning in the year 2000.  *See Skehan v. Village of Mamaroneck*, 465 F.3d at 106-08;
*Skrutski v. Marut*, 2006 WL 2660691, at *9-10 (M.D. Pa. Sept. 15, 2006) (denying summary
judgment on the issue of whether plaintiff was speaking as a private citizen or pursuant to official
duties); *Barclay v. Michalsky*, 451 F. Supp. 2d 386, 395-96 (D. Conn. 2006) (issue of fact as to
whether pursuant to official duties or as citizen); *Kodrea v. City of Kokomo*, Ind., 2006 WL
1750071, at *8 (S.D. Ind. June 22, 2006) (issue of fact).

For the reasons stated above, the Motion for Summary Judgment is **granted in part and
denied in part** on the First Amendment retaliation claim.[8]

_____

[8] Plaintiff now asserts in his Memorandum of Law in Opposition to the Motion for Summary Judgment that, in
addition to the First Amendment free speech protection claim, Plaintiff is also protected under the First Amendment
through the "right to petition the Government for a redress of grievances."  Pl.'s Mem. of Law at pp. 19-21.  However,

## C. Qualified Immunity

Defendant Jimino asserts that whether or not a constitutional violation occurred, she would be entitled to qualified immunity.  Defs.' Mem. of Law at pp. 8-10.  Plaintiff avers that qualified immunity is not applicable because the issue that arose in 2002 regarding reappointment was pre-*Garcetti* and, as the law existed in 2002, it was clearly established that "non-reappointment of an employee based on his speech" was prohibited.  Pl.'s Mem. of Law at p. 22-23.

Qualified immunity will shield "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *African Trade & Info. Center, Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker*, 229 F.3d 366, 370 (2d Cir. 2000).  This also applies "insofar as it was objectively reasonable for [the government officials] to believe that their acts did not violate those rights." *Mollica*, 229 F.3d at 370 (internal quotation marks and citations omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  The objectively reasonable test will be met "'if [officials] of reasonable competence could disagree' on the legality of the defendant's actions."  *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (further citation omitted)).  Public officials will further be entitled to qualified immunity if, "at the time the [official] was acting, the right in question was not clearly established[.]"  *Pitsley v. Ricks*, 2000 WL 362023, at * 1 n. 1 (N.D.N.Y. Mar. 31, 2000) (citing *Connell v. Signoracci*, 153 F.3d 74,

---

the Court notes that opposition papers are not the proper vehicle to instill new causes of action.  *See In re Private Capital Partners, Inc.*, 139 B.R. 120, 124-25 (Bankr. S.D.N.Y. 1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by instituting new causes of action in his opposition papers to defendants' dispositive motion is in direct contravention of and amounted to an attempt to circumvent the Federal Rules of Civil Procedure, namely Rule 15(a)).  Therefore, the Court will not consider this additional argument made by Plaintiff.

80 (2d Cir.1988)).

In order for the constitutional right to be clearly established, three elements must be met: "1) . . . [that] the right in question [be] defined with reasonable specificity; 2) [that] the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and 3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Mollica*, 229 F.3d at 371 (internal quotation marks and citations omitted) (alterations in original).

> Summary judgment will be granted based upon qualified immunity if no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Lennon*, 66 F.3d at 420 (internal quotation marks and citations omitted) (alteration in original).

In other words, "if the court determines that the only conclusion a rational jury could reach is that reasonable [officials] would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the [officials] is appropriate." *Id.* at 421.  Additionally, if the "factual record is not in serious dispute . . . . the ultimate legal determination whether . . . a reasonable [official] should have known he acted unlawfully is a question of law better left for the court to decide." *Id.* (citations omitted).

On the issues present in this case, at the times the relevant acts were committed, it was clearly established that while "a governmental entity enjoys significantly greater latitude when it acts in its capacity as employer . . ., the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their speech on matters of public importance." *Munafo v. Metro. Transp. Auth.*, 285 F.3d at 211 (citing *Waters v. Churchill,* 511 U.S. 661, 668, 671-75

(1994); *Rankin v. McPherson,* 483 U.S. 378, 383-84 (1987); *Connick v. Myers,* 461 U.S. at 142; &

*Pickering v. Board of Education,* 391 U.S. at 568); *see also Skehan v. Village of Mamaroneck*, 465

F.3d at 107-08.  An "employee's right to be free from such retaliation has been clearly established

since at least 1968." *Munafo v. Metro. Transp. Auth.*, 285 F.3d at 211.  Furthermore, Judge Sharpe

has held that because a factual motive exists, qualified immunity is precluded on a motion for

summary judgment.  Hr'g Tr. at p. 27, lines 12-21.  As noted previously, this finding is the law of

the case and there has been no reason presented to disturb the determination.

Therefore, the Motion for Summary Judgment on qualified immunity grounds is **denied**.

### D.  Other Claims

#### 1.  Violation of a "Policy or Custom" of the Municipality

Plaintiff claims that Defendant Rensselaer County is liable for actions taken by Jimino, as a

final policymaker, for failing to reappoint him as retaliation for exercising his First Amendment

right.  Compl. at ¶¶ 143-45.[9]

Municipalities "may be sued for constitutional deprivations visited pursuant to governmental

'custom' even though such a custom has not received formal approval through the body's official

decisionmaking channels." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  However,

the "doctrine of *respondeat superior* is not a basis for rendering municipalities liable under § 1983

for the constitutional torts of their employees." *Id.* at 663 n. 7 & 691; *see also Skehan v. Village of*

*Mamaroneck*, 465 F.3d at 108-09.  Only "when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

---

[9] The Court notes that Plaintiff does not address this cause of action in his Opposition to the Motion for Summary Judgment even though Defendants briefly touch upon the issue.  *See* Pl.'s Mem. of Law; Defs.' Mem. of Law at p. 10.

official policy, inflicts the injury that the government as an entity is responsible under § 1983[,]"

may the municipality be held liable. *Monell v. Dep't of Soc. Servs.*, 436 U.S. at 694.

Thus, in order to establish municipal liability, a plaintiff has to show a "direct causal link

between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton,*

*Ohio v. Harris*, 489 U.S. 378, 385 (1989) (quoted in *Bostic v. City of Binghamton*, 2006 WL

2927145, at *5 (N.D.N.Y. Oct. 11, 2006)).  "[C]ourts must apply rigorous standards of culpability

and causation . . . to ensure that the indirect - causation theory not result in the municipality's being

held liable solely for the actions of its employee." *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000)

(quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 405-07 (1997)) (internal quotation

marks omitted).  However, in establishing causation, a plaintiff need not show that "[t]he policy or

custom used to anchor liability [was] contained in an explicitly adopted rule or regulation."

*Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1991); *see also Bostic v. City of*

*Binghamton*, 2006 WL 2927145, at *5 (quoting *Sorlucco*).  Municipal liability may demonstrated if

the deprivation resulted from:

> (1) an officially promulgated policy endorsed or ordered by the municipality, *see*
> *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986); (2) a custom or practice that
> is so pervasive and widespread that the municipality had either actual or constructive
> knowledge of it, *see City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S. Ct. 915,
> 99 L. Ed. 2d 107 (1988); (3) actions taken or decisions made by the municipal employee
> who, as a matter of state law, is responsible for establishing municipal policies with
> respect to the area in which the action is taken, *see Praprotnik,* at 129-30; or (4) the
> failure of the municipality to train its employees such that the failure rises to the level
> of deliberate indifference to the constitutional rights of others, *see City of Canton v.*
> *Harris,* 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

*Perfetto v. Erie County Water Auth.*, 2006 WL 1888556, at *6 (W.D.N.Y. July 7, 2006); *see also*
*Sorlucco v. New York City Police Dep't*, 971 F.2d at 870-71; *Bostic v. City of Binghamton*, 2006
WL 2927145, at *5.

If a plaintiff complains that actions "were taken or caused by an official whose actions represent

*-32-*

official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Jeffes v. Barnes,* 208 F.3d at 57 (citations omitted).  A municipal official "need not be a municipal policymaker for all purposes . . . [but s]he must be 'responsible under state law for making policy *in that area* of the [municipality's] business.'" *Id.* (quoting *City of St. Louis v. Praprotnik,* 485 U.S. at 123) (emphasis in original).  The question of whether a municipal official has final policymaking authority is a legal question and must be determined on the basis of state law.  *Id.* (citations omitted).  Thus, the court must look to "relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989) (quoted in *Jeffes v. Barnes,* 208 F.3d at 57) (internal quotation marks omitted).

Here, Plaintiff has not pled that the municipality endorsed an officially promulgated policy, a custom or practice was so widespread and pervasive that the municipality had constructive knowledge of it, nor that the municipality failed to train its employees.  *See* Compl. at ¶¶ 142-45. Instead, Plaintiff solely seeks to establish municipal liability by stating that Jimino has final policymaking authority for Rensselaer County as to the appointment of the Director of the Bureau of Tax Services.  Compl. at ¶ 144.  Liability may attach to the municipality if a deprivation was caused by Jimino and she was "responsible for establishing final policy." *Skehan v. Village of Mamaroneck*, 465 F.3d at 108-09 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  If Jimino was indeed the final decisionmaker for Rensselaer County, the municipality may be held liable.  *See Pembaur v. City of Cincinnati*, 475 U.S. at 485; *see also Gronowski v. Spencer*, 424 F.3d 285, 296-97 (2d Cir. 2005) (finding that because the defendant was the policymaker of the city, the city could be held liable); *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003)

(stating that because the Suffolk County police commissioner had the "authority to set department-wide personnel policies[,]" there was a sufficient basis to holding the county liable for decisions made by the commissioner).

In this case, New York State statutory law states that "[t]he director shall be appointed by the legislative body of the county except that in a county in which heads of departments are appointed by the county executive or county manager, such director shall be appointed by such county executive or county manager."  N.Y. REAL PROP. TAX LAW § 1530(1).  While it is reasonable to believe that Jimino, as County Executive, had final decisionmaking authority as to appointments, whether she had final policymaking authority in that area is not so clear and niether party has presented this Court with any evidence to aid in this determination.  *See Pembaur v. City of Cincinnati*, 475 U.S. at 481-83 (noting that municipal liability only attaches where a decisionmaker has final policymaking authority); *Hurdle v. Bd. of Educ. of the City of New York*, 113 Fed. Appx. 423, 426-27 (2d Cir. 2004) (unpublished decision extrapolating the difference between a final decisionmaker and a final policymaker and noting that only with the latter may a municipality be liable).  Thus, as the Court was not presented with sufficient evidence by any party to determine, as a matter of law, whether Jimino had final policymaking authority in the area of employment decisions, a question of fact exists as to the scope of Jimino's final policymaking authority in this area.  *See Cipolla v. County of Rensselaer*, 129 F. Supp. 2d 436, 457 (N.D.N.Y. 2001) (citing *Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 661 (S.D.N.Y. Apr. 4, 2000) for the proposition that the Monell liability claim was denied "where plaintiff provided no evidence to link the policy maker to the decisions resulting in alleged malicious prosecution"); *see also Iannillo v. County of Orange*, 187 F. Supp. 2d 170, 187 (S.D.N.Y. 2002).

Therefore, the Motion for Summary Judgment is **denied** on this issue.

## 2.  Breach of Contract

Plaintiff asserts that after he was "terminated," Jimino promised to assist him in finding another job, but Jimino failed to fulfill her promise, thus constituting a breach of contract.[10]  Compl. at ¶¶147-51.  Defendants ask this Court to decline to exercise jurisdiction on this state law claim. Defs.' Mem. of Law at p. 10.  Although the Court respects Defendants' position, the Court will nevertheless address the breach of contract cause of action.

In order "[t]o prevail on a claim for breach of contract, a plaintiff must prove (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages." *Weinberg v. Mizuho Capital Markets Corp.*, 2003 WL 22462022, at *7 (S.D.N.Y. Oct. 30, 2003) (citing *Terwilliger v. Terwilliger,* 206 F.3d 240, 245-46 (2d Cir. 2000)).

Here, Plaintiff seems to allege that there was an oral contract made between him and Jimino in that she would try and help him find a job, that Jimino breached the contract by failing to find him other employment, and as a result he suffered economic loss because he was unemployed after he was not reappointed to his position as Director of Real Property Tax Services.  *See* Dkt. Nos. 25 & 41, Pl.'s Dep., dated July 27, 2004, at p. 16, lines 21-24, p. 17, lines 1-24, p. 18, lines 1-24, p. 19, lines 1-24, p. 20, lines 1-15, p. 36, lines 2-17, p. 37, lines 4-24, & p. 38, lines 3-24.  On March 1, 2002, Plaintiff apparently learned he would not be reappointed and, on that same day, Jimino supposedly made a promise to aid Plaintiff in his search for new employment.  *Id.* at p. 13, lines 10-15,  p. 14, lines 1-24, & p. 15, lines 1-3.  Plaintiff states that in consideration for Jimino aiding in

---

[10] The Court also notes that Plaintiff does not address the breach of contract claim in his Opposition to the Motion for Summary Judgment though Defendants bring up the issue.  *See* Pl.'s Mem. of Law; Defs.' Mem. of Law at p. 10.

Plaintiff's job search, he would refrain from "generat[ing] any kind of negative publicity[.]" *Id.* at p. 14, lines 9-13.  Plaintiff contends, however, that Jimino did not call or write letters to anyone to assist him in finding other employment.  *Id.* at p. 17, lines 3-13.  Then, after an encounter in April 2002 with Jimino, Plaintiff states that he brought her copies of his resume and thanked her for her assistance.  *Id.* at p. 18, lines 8-18.  In September 2002, Plaintiff sent Jimino a letter stating that he was still unemployed and requested continued help.  *Id.* at p. 18, lines 22-24, & p. 19, lines 1-4.  A member of Jimino's staff did respond but nothing came of the telephone call.  *Id.* at p. 19, lines 3-13.  Although Plaintiff asked Jimino to help him search for employment, he still sought employment on his own.  *Id.* at p. 17, lines 22-24.

While Plaintiff states he has no knowledge of any efforts by Jimino to aid him in his job search, Jimino asserts she contacted Tom Griffin and inquired whether any positions were available in ORPS, spoke to someone in Senate Finance to tell them Plaintiff was qualified in the real property area, and checked the ORPS and New York State Association of Counties websites for job postings, which would be passed on to Plaintiff.  *See* Jimino Dep. at p. 62, lines 4-24, p. 63, lines, 1-24, & p. 64, line 1.

In the previous Motion for Summary Judgment, as noted above, Judge Sharpe discussed the breach of contract claim.  Hr'g Tr. at p. 12, lines 15-25, p. 13, lines 1-5, p. 28, lines 20-25, & p. 29, lines 1-14; *see supra* n. 1 & pp. 15-16.  Judge Sharpe extrapolated upon the divergent views regarding the performance of the contract and therefore denied the Motion for Summary Judgment on this issue as it pertained to Jimino in her personal capacity.  Hr'g Tr. at p. 12, lines 15-25, p. 13, lines 1-5, p. 28, lines 20-25, & p. 29, lines 1-14.  This finding would be considered law of the case and the parties have provided no compelling reason why this Court should depart from the

determination made by Judge Sharpe.

Therefore, the Motion for Summary Judgment is **denied** on the breach of contract claim.

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that the Motion for Summary Judgment (Dkt. No. 38) be **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED**, that the parties notify this Court by filing a letter electronically, indicating the dates and times they are available to participate in a telephonic conference during the week of January 22, 2007; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties by regular mail.

SO ORDERED.

Date:   January 19, 2007
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge